ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 17 2010

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| GOLDMAN, SACHS & CO.<br><br>  Plaintiff,<br><br>v.<br><br>DAVID GREENE, CRAIG SAVAGE,<br>ANDREW THOMPSON, SHARRAN<br>SRIVATSAA, JOHN PITT,<br>STEPHANIE DENNARD and KIM<br>TYSON<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION
FILE NO. _____

**1:10-CV-0453**

**RWS**

## VERIFIED COMPLAINT FOR
## INJUNCTIVE RELIEF IN AID OF ARBITRATION

Goldman, Sachs & Co. ("Goldman Sachs") files this Verified Complaint against Defendants David Greene ("Greene"), Craig Savage ("Savage"), Andrew Thompson ("Thompson"), Sharran Srivatsaa ("Srivatsaa"), John Pitt ("Pitt"), Stephanie Dennard ("Dennard"), and Kim Tyson ("Tyson").

### INTRODUCTORY STATEMENT

1.

This case involves the pirating of a team of high-level investment managers and their support staff within Goldman Sachs's Private Wealth Management Group

10514734v.3

in Atlanta Georgia, and their illicit solicitation of customers and employees. Three Investment Professionals at the Vice President level (Greene, Savage, and Thompson), two Associates (Pitt and Srivatsaa), and two Managers, also at the Vice President level (Dennard and Tyson) abruptly left Goldman Sachs on the evening of February 5, 2010 for Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse First Boston LLC) ("Credit Suisse"), one of Goldman Sachs's competitors after Credit Suisse offered the team tens of millions of dollars to leave. Defendants immediately began soliciting Goldman Sachs's clients and employees in violation of the non-solicitation agreements agreed to by Greene, Savage, Thompson, Pitt and Srivatsaa.   Moreover, Dennard and Tyson have tortiously interfered with Goldman Sachs's Non-Solicitation agreements with Greene, Savage Thompson, Pitt and Srivatsaa by soliciting employees on their behalf.    Upon information and belief Defendants have misappropriated and improperly used Goldman Sachs's confidential information and trade secrets, including confidential customer lists.

2.

Defendants are all financial industry registered employees, and are therefore subject to the requirements of the Financial Industry Regulatory Authority ("FINRA", formerly the NASD), which requires arbitration of disputes between

individuals and businesses affiliated with FINRA.   Goldman Sachs is also subject
to FINRA's arbitration requirements.   True and correct copies of the U-4 forms
entered into by each Defendant which subject them to FINRA are attached hereto
as Exhibits A through G, respectively.

3.

Contemporaneous  with  the  filing  of  this  lawsuit  against  Defendants,
Goldman Sachs has initiated arbitration proceedings against Defendants under the
applicable FINRA rules.   Consequently,  Goldman Sachs seeks only injunctive
relief in this Court in aid of the arbitration to preserve the *status quo* pending the
resolution of the arbitration proceeding.   A true and correct copy of the arbitration
demand and statement of claim is attached hereto as Exhibit H.

## PARTIES, JURISDICTION, AND VENUE

4.

Goldman Sachs is a New York Limited Partnership with its principal place
of business in New York, New York.   It is a leading global banking, securities, and
investment management firm that provides a wide range of services to a substantial
and diversified client base.   Founded in 1869, it is one of the most respected firms
in its field.

5.

Among its other activities, Goldman Sachs provides private wealth management services to high net worth clients. This matter arises from Goldman Sachs's Private Wealth Management Group in its Atlanta, Georgia office.

6.

Defendants are employees or former employees of Goldman Sachs who reside in the State of Georgia. Greene resides at 857 Fairfield Road, Atlanta, Georgia, 30327; Savage resides at 905 Honour Circle, Atlanta, Georgia 30305; Thompson resides at 2692 Bohler Road, Atlanta, Georgia, 30327; Pitt resides at 66 Peachtree Hills Ave N.E., Atlanta, Georgia 30305; Srivatsaa resides at 3604 Ashcroft Bend NE, Atlanta, Georgia, 30319; Dennard resides at 2540 Thompson Rd. NE, Atlanta, Georgia 30319; and Tyson resides at 2073 Northside Drive, Atlanta, Georgia, 30305.

7.

The Defendants can be served with process at their respective addresses listed above, or at 3414 Peachtree Road N.E., Atlanta, Georgia, 30326, which is the Atlanta, Georgia office of Credit Suisse, the company that hired these employees and for which Defendants now are working.

8.

The Court has subject matter jurisdiction over this matter pursuant to 29 U.S.C. § 1332, because this matter involves a controversy between citizens of different states, New York and Georgia, and the amount in controversy exceeds the sum or value of $75,000.

9.

Venue is proper in this Court pursuant to 29 U.S.C. § 1391 because the events upon which this Complaint is based occurred in the geographic territory of the Northern District of Georgia.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### Defendants' Employment With Goldman Sachs

10.

Prior to Defendants' departure, Goldman Sachs's Atlanta office employed 26 private wealth management financial advisors covering ten (10) states in the southeastern United States. Each financial advisor was supported by one or more staff employees.

11.

Defendants, and the other financial advisors in Goldman Sachs's Atlanta office, among other duties, manage the private portfolios of individuals, families,

-5-

family businesses, and institutions.    Because of the nature of their business, the advisors and their support staff are able to develop unique and personal relationships with Goldman Sachs's clients.

12.

During the course of these close client relationships, Goldman Sachs's financial advisors and their staff members learn highly sensitive and confidential information about those clients, including the client's personal/family financial, estate planning and tax information, investment needs and strategies, investment and trading tendencies, and similar financial information.

13.

Moreover, the financial advisors and their staff have access to and regularly use highly confidential and trade secret information of Goldman Sachs, including investment strategies, research regarding investments and potential investments, and proprietary methodologies and metrics.    This trade secret information includes information that was created by the Defendants on behalf of Goldman Sachs, and information created by other Goldman Sachs employees and analysts, who then provided such information to Defendants.

14.

Goldman Sachs's client information as described in Paragraph 12, above,

-6-

and the strategic analysis and information described in Paragraph 13, above, is kept confidential within Goldman Sachs, Goldman Sachs takes reasonable efforts to protect its secrecy, and such information derives value, in part, from this information being kept confidential.

15.

Greene was hired by Goldman Sachs on or about August 3, 1998. Greene most recently served as a Vice-President within Goldman Sachs's Private Wealth Management Group in Atlanta, Georgia.

16.

Savage was hired by Goldman Sachs on or about August 3, 1998. Savage also most recently served as a Vice President within Goldman Sachs's Private Wealth Management Group in Atlanta, Georgia.

17.

Thompson was hired by Goldman Sachs on or about August 12, 2002. Thompson also most recently served as a Vice President within Goldman Sachs's Private Wealth Management Group in Atlanta, Georgia.

18.

Pitt was hired by Goldman Sachs on or about August 4, 2008. Pitt most recently served as an Associate within Goldman Sachs's Private Wealth

Management Group in Atlanta, Georgia.

19.

Srivatsaa was hired by Goldman Sachs on or about August 4, 2008. Srivatsaa most recently served as an Associate within Goldman Sachs's Private Wealth Management Group in Atlanta, Georgia.

20.

Dennard was hired by Goldman Sachs on or about August 28, 2000. Dennard most recently served as a Manager at the Vice President level within Goldman Sachs's Private Wealth Management Group in Atlanta, Georgia.

21.

Tyson was hired by Goldman Sachs on or about July 19, 2004. Tyson most recently served as a Manager at the Vice President level within Goldman Sachs's Private Wealth Management Group in Atlanta, Georgia.

22.

Defendants were highly placed, high-performing and highly compensated employees of Goldman Sachs. For example, the 2009 compensation for Greene personally exceeded $1 million.

23.

Goldman Sachs invested a great deal of time, effort, and money into

-8-

providing Defendants with the resources to perform their respective duties at Goldman Sachs.    Goldman Sachs also provided Defendants with highly confidential and trade secret information which enabled Defendants to provide excellent service to Goldman Sachs's clients, and to develop their reputations as financial advisors with respect to those clients.    As a result, each Defendant had direct and personal contact with Goldman Sachs's customers in furtherance of Goldman Sachs's business.

24.

Defendants worked as a team, in partnership, providing wealth management services to existing Goldman Sachs clients and soliciting new Goldman Sachs clients.    Defendants were trusted employees who were provided with substantial firm resources and training to cultivate and serve clients for the firm's benefit.

25.

Defendants were trusted employees who were provided with substantial firm resources and training to cultivate and serve clients for the firm's benefit.    In many cases, Goldman Sachs provided direct introductions to new clients or provided Defendants with client accounts brought from elsewhere in the firm.

26.

Defendants substantially benefitted from Goldman Sachs's goodwill,

-9-

reputation, diverse firm-wide resources, name recognition, existing customer base, and unique access to high net worth customer opportunities.

## Defendants' Agreements With Goldman Sachs

27.

Greene, Savage, Thompson, Pitt and Srivatsaa each entered into agreements with Goldman Sachs (which, as more particularly described below, are attached as Exhibits J, K, N, O and P hereto) which, among other provisions, required those employees to (1) protect Goldman Sachs's trade secrets, confidential information, and property, (2) refrain from soliciting certain customers and employees, and (3) return Goldman Sachs's property following the cessation of their employment (collectively, the "Non-Solicitation Agreements").

28.

On or about August 5, 1998, Greene and Savage each signed a contract with Goldman Sachs entitled "Employee Agreement Regarding Confidential Information and Materials, Non-Solicitation and Non-Competition." (the "Greene/Savage Non-Solicitation Agreement"). True and correct copies of (1) the form of the Greene/Savage Non-Solicitation Agreement; and (2) The form agreement along with Greene and Savage's respective signatures to the Greene/Savage Non-Solicitation Agreement are attached hereto as Exhibits I, J,

-10-

and K, respectively.

29.

On or about May 7, 2001, the Greene/Savage Non-Solicitation Agreements were amended to remove the requirement that Greene and Savage not compete with Goldman Sachs for 90 days following the termination of their employment. Those amendments, however, expressly preserved the requirement that Greene and/or Savage not solicit certain Goldman Sachs customers or employees following termination of employment. True and correct copies of the amendments to the Greene/Savage Non-Solicitation Agreement are attached hereto as Exhibits L and M, respectively.

30.

On or about December 27, 2001, Thompson signed an "Employee Agreement Regarding Confidential Information and Materials and Non-Solicitation" (the "Thompson Non-Solicitation Agreement"). A true and correct copy of the Thompson Non-Solicitation Agreement is attached hereto as Exhibit N.

31.

On or about September 7, 2007 and October 1, 2007, respectively, Pitt and Srivatsaa signed a similar "Employee Agreement Regarding Confidential Information and Materials and Non-Solicitation" (the "Pitt/Srivatsaa Non-

-11-

Solicitation Agreement"). True and correct copies of the Pitt/Srivatsaa Non-Solicitation Agreements are attached hereto as Exhibit O and P, respectively.

**Relevant Terms Of The Agreements Between Defendants And Goldman Sachs**

32.

The Non-Solicitation Agreements, while differing in some respects, contain similarly worded nonsolicitation, confidentiality, and return-of-materials covenants.

33.

The Non-Solicitation Agreements state:

> 3.(a) During your employment with Goldman Sachs and for a period of 90 days following the termination of your employment, you agree that you will not, in any manner, directly or indirectly, solicit by mail, by e-mail, by telephone, by personal meeting, or by any other means, either directly or indirectly, any client or prospective client of Goldman Sachs to whom you provided services, with or for whom you transacted business, or whom you solicited, at any time during the twelve-month period preceding the termination of your employment with Goldman Sachs or otherwise interfere with or damage (or attempt to interfere or damage) any relationship between Goldman Sachs and any such client or prospective client. A "prospective client" is any person or entity with whom you have communicated or whom you solicited for the purposes of obtaining or transacting business and for whom you have analyzed concerning potential business at any time during the twelve-month period prior to the termination of your employment with Goldman Sachs.

-12-

The solicitation prohibited herein shall be any contact or communication of any kind whatsoever, regardless of who initiates the contact, for the purpose of inviting, encouraging or requesting any client or prospective client to: (i) transfer business from Goldman Sachs to you or any other person; (ii) open a new account for the purchase and sale of securities and other instruments with you or any other person or (iii) otherwise discontinue, abandon or diminish a business relationship with Goldman Sachs.

34.

Defendants[1] also agreed that individuals whom they knew or were familiar with prior to joining Goldman Sachs were covered by the Non-Solicitation Agreements, given the unique advantages provided to them while working for Goldman Sachs:

While employed by Goldman Sachs, you may develop business with individuals you knew or were familiar with prior to joining Goldman Sachs. In developing such business, you will be acting as a representative of Goldman Sachs and will be utilizing and benefiting from Goldman Sachs' goodwill, reputation, name recognition, and other assets and resources. You therefore agree that such people (excepting only your direct relatives) will be subject to the provisions of this paragraph 3.

---

[1] For purposes of Paragraphs 34 through 38 of this Verified Complaint, the term "Defendants" refers to Greene, Savage, Thompson, Pitt, and Srivatsaa only, and excludes Dennard and Tyson.

35.

Defendants also agreed not to solicit Goldman Sachs's employees, as follows:

> [3](b)  During your employment with Goldman Sachs and for a period of 90 days following termination of your employment with Goldman Sachs, you agree that you will not, in any manner, directly or indirectly, solicit, encourage, or enter into any arrangement with any person who is an employee of Goldman Sachs to terminate employment with Goldman Sachs or to apply for or accept employment with any business or entity which does any business in competition with any business of Goldman Sachs.

36.

Defendants further agreed to keep Goldman Sachs's proprietary information confidential, as described in Paragraphs 1 and 2 of the Non-Solicitation Agreements:

> 1.  Confidential and Proprietary Information and Materials shall be used only for Goldman Sachs' benefit and only as authorized and for the purposes intended by Goldman Sachs.
>
> 2.  You will hold all Confidential and Proprietary Information and Materials in strict confidence and, except for the above authorized issues, will not, nor will you permit any agent or person under your control to use, give, disclose, copy, reproduce, sell, assign, license, market or transfer Confidential and Proprietary Information and Materials to any person, firm or corporation outside Goldman Sachs or to give or disclose

-14-

Confidential and Proprietary Information and Materials to any partner or employee of Goldman Sachs who does not have a need to know or see the Confidential and Proprietary Information and Materials. This provision applies without limitation to unauthorized writings of any kind containing such information or materials, including books and articles.

37.

Moreover, with respect to returning Goldman Sachs's property and information, the Non-Solicitation Agreements require the following:

Upon the termination of your employment (or earlier if requested by Goldman Sachs), you will return to Goldman Sachs all originals and copies of documents and other materials, including handwritten materials and electronically stored data, containing or derived from Confidential and Proprietary Information and Materials that are in your possession or control, at or away from Goldman Sachs' premises, accompanied, if requested, by a certificate signed by you and satisfactory to Goldman Sachs to the effect that all such Confidential and Proprietary Information and Materials have been returned.

38.

The Non-Solicitation Agreements have a New York consent to jurisdiction and venue, and a New York choice of law provision and are governed by New York law.

39.

Defendants also agreed to observe certain other confidentiality requirements

-15-

as employees of Goldman Sachs.    True and correct copies of policies governing Defendants' use and/or disclosure of confidential information are attached hereto as Exhibits Q, R, S, T and U.

### Defendants' Abrupt Departure From Goldman Sachs

40.

On Friday, February 5, 2010, shortly after 6:00 p.m., all seven Defendants sent resignation letters and/or e-mails to David Fox ("Fox"), the head of Goldman Sachs's Atlanta office.  Prior to Fox receiving those letters/e-mails, Defendants had provided no notice that they (or any of them individually) intended to leave Goldman Sachs.    In fact, Savage and Thompson had previously informed Fox directly to the contrary.

41.

That same evening, Thompson and Savage met personally with Fox, and informed him that the entire group was to be employed by Credit Suisse, one of Goldman Sachs's direct competitors.    The offices of Credit Suisse are located within the same building as Goldman Sachs's offices on Peachtree Road in Atlanta.

42.

During their meeting with Fox on that February 5 evening, Thompson and

Savage assured Fox specifically that they and Greene intended to abide by a contractual obligation to provide sixty days advance notice prior to resigning as was required in certain other agreements they had with Goldman Sachs. Thompson and Savage also assured Fox that the group of departing employees intended to abide by the provisions contained in their respective Non-Solicitation Agreements with Goldman Sachs.

43.

On Saturday, February 6, 2010, at approximately 5:00 a.m., Greene called Fox, waking him up at that early hour, and informed Fox that he had "made a huge mistake" in leaving Goldman Sachs for Credit Suisse, and that the move was motivated by "money only." Greene informed Fox that Credit Suisse had agreed to pay him $11 million to leave Goldman Sachs. Greene told Fox that the move to Credit Suisse would not benefit the clients he had serviced on behalf of Goldman Sachs, even if they agreed to follow Greene to Credit Suisse.

44.

Between 5:00 a.m. on Saturday, February 6 and 8:00 a.m. on Monday, February 8, Greene – who was prior to his departure, a top producer – waffled back and forth, telling Fox first that he would stay with Goldman Sachs, then stating that he was leaving for Credit Suisse.

-17-

45.

Greene told Fox over the course of these conversations that he would stay with Goldman Sachs if he could convince Dennard, his primary assistant, to also stay with Goldman Sachs. As of their last conversation at 8:00 a.m. on Monday, February 8, Greene indicated to Fox that he would be staying with Goldman Sachs.

46.

At approximately 10:00 a.m. on Monday, February 8, rather than talking to Fox directly, Greene left Fox a voicemail stating that he had made his final decision and was departing Goldman Sachs for Credit Suisse.

## Greene, Savage, Thompson, Pitt, and Srivatsaa Immediately Breach Their Agreements With Goldman Sachs, and Defendants Dennard and Tyson Tortiously Interfere With Those Agreements

47.

At the time of their departure, Defendants were, collectively, the principal advisors to over 140 Goldman Sachs clients.

48.

Almost immediately after Defendants' departure, Goldman Sachs began receiving reports from those clients that one or more Defendants had contacted them and requested that they move their accounts from Goldman Sachs to Credit Suisse.

-18-

49.

Since Defendants' departure on February 5, representatives from Goldman Sachs have contacted all or nearly all of the clients formerly advised by Defendants.   May of those clients have reported solicitations from Defendants, some as early as February 6.

50.

Goldman Sachs clients have reported that at least one of the Defendants told them there had been a "big shakeup" at Goldman Sachs, suggesting untruthfully to the clients that Defendants' departure had destabilized the Atlanta office.

51.

Defendants have also solicited Goldman Sachs employees to leave Goldman Sachs to work at Credit Suisse.

52.

On February 8, 2010, at about 6:15 a.m., Justin Berman, a Vice-President, received an unsolicited call from Greene, who attempted to recruit Berman to Credit Suisse.   Greene told Berman that Credit Suisse would pay him $10 million if he would leave Goldman Sachs for Credit Suisse.

53.

Analyst William Tuggle, who worked closely with Defendants prior to their

-19-

departure, has received multiple phone calls, e-mails and text messages from one or more of the Defendants requesting that he meet with them.

54.

On February 10, 2010, Srivatsaa called Goldman Sachs advisor Joseph J. ("J.J.") Marus and asked him to meet him at a local restaurant for drinks. Srivatsaa told Marus that he believed the Goldman Sachs Private Wealth Management Group would be severely weakened by the departure of himself and the other Defendants.

55.

Upon information and belief, the purpose of this meeting was for Srivatsaa to recruit Marus to Credit Suisse.

56.

During Srivatsaa's meeting with Marus, he informed Marus that a number of clients were planning to move from Goldman Sachs to Credit Suisse. When Marus asked how the Defendants were talking to clients without violating their non-solicitation agreements, Srivatsaa specifically stated that Dennard and Tyson were calling Goldman Sachs clients on the other Defendants' behalf because Dennard and Tyson were not subject to non-solicitation agreements.

57.

Srivatsaa further opined during his meeting with Marus that while Savage, Greene, and Thompson could not directly call Goldman Sachs clients without violating their agreements with Goldman Sachs, they could field calls initiated by clients. Srivatsaa stated that Dennard and Tyson would call Goldman Sachs clients and ask them to call Savage, Greene or Thompson, and he described this procedure as a "loophole" in their non-solicitation agreements. Mr. Srivatsaa also stated that he was free to call whomever he wanted as of February 10, 2010.

58.

Srivatsaa also informed Marus that he intended to call on 17 clients from the "T-list" of Dennis Howie, a Private Wealth Manager who continues to work for Goldman Sachs. The T-list is an internal Goldman Sachs system for reserving clients and/or potential clients/prospects to a team so that they are not called on by multiple Goldman Sachs representatives. The T-list is confidential, and the information contained therein is a trade secret of Goldman Sachs.

59.

On information belief, and based in part on Srivatsaa's acknowledgement that he was intent on contacting clients from another Goldman Sachs employee's T-list, Defendants have misappropriated confidential and trade secret information

-21-

from Goldman Sachs.

## CLAIM FOR RELIEF

### Goldman Sachs Is Entitled To Injunctive Relief In Aid of Arbitration Resulting From Defendants' (1) Breach of Contract; (2) Misappropriation of Trade Secrets; and (3) Tortious Interference With Goldman Sachs's Contracts

**A.    Goldman Sachs Is Entitled To Injunctive Relief For Defendants' Breach Of Their Respective Non-Solicitation Agreements With Goldman Sachs (Greene, Savage, Thompson, Pitt and Srivatsaa Only).**

60.

Goldman Sachs incorporates and realleges the allegations contained in Paragraphs 1 through 59 hereof, as if fully set forth herein.

61.

The Non-Solicitation Agreements are valid and enforceable contracts between Goldman Sachs and Greene, Savage, Thompson, Pitt and Srivatsaa, respectively.

62.

On information and belief, Greene, Savage, Thompson, Pitt and Srivatsaa each breached their respective Non-Solicitation Agreements by soliciting Goldman Sachs's clients in violation of Section 3.(a) thereof.

63.

On information and belief, Greene, Savage, Thompson, Pitt and Srivatsaa

-22-

each breached their respective Non-Solicitation Agreements by soliciting Goldman Sachs's employees to work for Credit Suisse in violation of Section 3.(b) thereof.

64.

On information and belief, Greene, Savage, Thompson, Pitt and Srivatsaa each breached their respective Non-Solicitation Agreements by using, disclosing, and/or retaining Goldman Sachs's property, confidential and proprietary information and/or trade secrets in violation of Sections 1, 2 and 4 thereof.

65.

Goldman Sachs is likely to prevail on the merits of its claim in arbitration to enforce the non-solicitation, confidentiality, and return of materials provisions contained in the Non-Solicitation Agreements between Goldman Sachs and Greene, Savage, Thompson, Pitt and Srivatsaa.

66.

Goldman Sachs will suffer irreparable harm absent a temporary restraining order and preliminary injunction being issued prohibiting Greene, Savage, Thompson, Pitt and Srivatsaa from violating the non-solicitation, confidentiality, and return of materials provisions contained in their respective Non-Solicitation Agreements.

-23-

67.

The balance of harms favors the issuance of a temporary restraining order and preliminary injunction prohibiting Greene, Savage, Thompson, Pitt and Srivatsaa from violating the non-solicitation, confidentiality, and return of materials provisions contained in their respective Non-Solicitation Agreements.

68.

The public interest favors the issuance of a temporary restraining order and preliminary injunction prohibiting Greene, Savage, Thompson, Pitt and Srivatsaa from violating the non-solicitation, confidentiality, and return of materials provisions contained in their respective Non-Solicitation Agreements.

69.

A temporary restraining order and preliminary injunction should be entered prohibiting Greene, Savage, Thompson, Pitt and Srivatsaa from violating the non-solicitation, confidentiality, and return of materials provisions contained in their respective Non-Solicitation Agreements.

**B. Goldman Sachs Is Entitled To A Temporary Restraining Order and a Preliminary Injunction As A Result Of Defendants' Misappropriation of Goldman Sachs's Confidential Information And Trade Secrets (All Defendants).**

70.

Goldman Sachs incorporates and realleges the allegations contained in

-24-

Paragraphs 1 through 69 hereof, as if fully set forth herein.

71.

Defendants agreed to various Goldman Sachs policies requiring them to keep confidential Goldman Sachs's confidential information and trade secrets.

72.

Upon information and belief, Defendants have acquired information, documents and/or data belonging to Goldman Sachs, including but not limited to customer information, proprietary analysis and data, T-lists, and/or customer lists which constitute trade secrets pursuant to the Georgia Trade Secrets Act of 1990, O.C.G.A. § 10-1-760, et seq. (the "Trade Secrets").

73.

Goldman Sachs has a property right and a protected interest in its Trade Secrets and confidential information.

74.

The Trade Secrets and confidential information misappropriated by Defendants were not commonly known by or available to the public.

74.

Goldman Sachs took reasonable efforts to maintain the secrecy of the Trade Secrets and confidential information and maintained the Trade Secrets and

-25-

confidential information in such a way that they could not be readily ascertainable by outside parties.

75.

On information and belief, Defendants acquired or conspired to acquire Goldman Sachs's Trade Secrets and confidential information: (1) in circumstances giving rise to a duty to maintain the secrecy of such information or limit its use; or (2) from or through a person who owed a duty to Goldman Sachs to maintain the secrecy of such information or limit its use; or (3) by improper means including the breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit its use, breach of a duty of loyalty, conversion and/or other improper means.

76.

Based on information and belief, before Defendants resignation or attempted resignation from Goldman Sachs and continuing to date, Defendants disclosed and/or used some or all of the above-described Trade Secrets or confidential information without the express or implied consent of Goldman Sachs.

77.

At all times that Defendants disclosed or used such information, they knew or had reason to know: (1) they had acquired such information in circumstances

-26-

giving rise to a duty to maintain its secrecy or limit its use; or (2) they had derived such information from or through a person who owed a duty to Goldman Sachs to maintain its secrecy or limit its use.

78.

The acquisition, disclosure and/or use by Defendants of the above-described information constitutes a misappropriation of trade secrets under the Georgia Trade Secrets Act of 1990, O.C.G.A. § 10-1-760, et seq.

79.

The acquisition, disclosure and/or use by Defendants of the above-described information violates their contractual obligations to keep such information confidential.

80.

Goldman Sachs is likely to prevail on the merits of its claim in arbitration relating to Defendants' misappropriation of its trade secrets and confidential information.

81.

Goldman Sachs will suffer irreparable harm absent a temporary restraining order and preliminary injunction being issued prohibiting Defendants from using, retaining, and/or disclosing Goldman Sachs's trade secrets and confidential

-27-

information.

82.

The balance of harms favors the issuance of a temporary restraining order and preliminary injunction prohibiting Defendants from using, retaining, and/or disclosing Goldman Sachs's trade secrets and confidential information.

83.

The public interest favors the issuance of a temporary restraining order and preliminary injunction prohibiting Defendants from using, retaining, and/or disclosing Goldman Sachs's trade secrets and confidential information.

84.

A temporary restraining order and preliminary injunction should be entered which prohibits Defendants from using, retaining, and/or disclosing any of Goldman Sachs's trade secrets, and which requires Defendants to immediately return Goldman Sachs's trade secrets and confidential information.

**C.    Goldman Sachs Is Entitled To A Temporary Restraining Order and a Preliminary Injunction To Prevent Defendants' Tortious Interference With Goldman Sachs's Contracts (Tyson and Dennard).**

85.

Goldman Sachs incorporates and realleges the allegations contained in Paragraphs 1 through 84 hereof, as if set forth fully herein.

-28-

86.

The Non-Solicitation Agreements are valid and enforceable contracts.

87.

The Non-Solicitation Agreements Goldman Sachs prevent Greene, Savage, Thompson, Pitt and Srivatsaa from "directly or indirectly" soliciting certain Goldman Sachs clients or employees.

88.

Tyson and Dennard have contacted Goldman Sachs clients on behalf of Greene, Savage, Thompson, Pitt and/or Srivatsaa for the purpose of inducing those clients to cease doing business with Goldman Sachs.   These contacts constitute an indirect, but pointed solicitation of those clients by Greene, Savage, Thompson, Pitt and/or Srivatsaa.

89.

On information and belief, Dennard and Tyson know of the contractual obligations of Greene, Savage, Thompson, Pitt and/or Srivatsaa not to solicit certain Goldman Sachs clients.

90.

Dennard and Tyson are tortiously interfering with Goldman Sachs's contracts with Greene, Savage, Thompson, Pitt and/or Srivatsaa by serving as the

-29-

conduit for those employees to indirectly solicit prohibited clients. Dennard and Tyson have acted improperly and without privilege.

91.

Goldman Sachs is likely to prevail on the merits of its claim in arbitration that Dennard and Tyson's have tortiously interfered with its contracts, as described above.

92.

Goldman Sachs will suffer irreparable harm absent a temporary restraining order and preliminary injunction prohibiting Dennard and Tyson from tortiously interfering with Goldman Sachs's contracts with Greene, Savage, Thompson, Pitt and/or Srivatsaa.

93.

The balance of harms favors the issuance of a temporary restraining order and preliminary injunction prohibiting Dennard and Tyson from tortiously interfering with Goldman Sachs's contracts with Greene, Savage, Thompson, Pitt and/or Srivatsaa.

94.

The public interest favors the issuance of a temporary restraining order and preliminary injunction prohibiting Dennard and Tyson from tortiously interfering

with Goldman Sachs's contracts with Greene, Savage, Thompson, Pitt and/or Srivatsaa.

95.

A temporary restraining order and preliminary injunction should be issued preventing Dennard and Tyson from tortiously interfering with Goldman Sachs's contracts with Greene, Savage, Thompson, Pitt and/or Srivatsaa.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, Goldman Sachs prays as follows:

1.   Interlocutory injunctive relief:

  (a)   restraining Defendants from using or otherwise disclosing Goldman Sachs's proprietary and confidential information and/or trade secrets;

  (b)   requiring Defendants to immediately to return all documents, data, or information containing Goldman Sachs proprietary and confidential information and/or trade secrets and all other property belonging to Goldman Sachs that is in Defendants' possession, custody, or control;

  (c)   enjoining and restraining Greene, Savage, Thompson, Pitt and Srivatsaa from directly or indirectly soliciting Goldman Sachs's clients and employees as provided in their respective Non-Solicitation Agreements;

  (d)   enjoining and restraining Dennard and Tyson from soliciting Goldman

-31-

Sachs's clients or employees on behalf of Greene, Savage, Thompson, Pitt or Srivatsaa.

(e)     such other and further relief as the Court deems just and proper.

This 17th day of February, 2010.

**HAWKINS & PARNELL, LLP**

Matthew A. Boyd
Georgia Bar No. 027645
mboyd@hplegal.com
Ronald G. Polly, Jr.
Georgia Bar No. 538264
rpolly@hplegal.com
Alex M. Barfield
Georgia Bar No. 037147
abarfield@hplegal.com

4000 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, Georgia 30308
Telephone: (404) 614-7400
Facsimile:  (404) 614-7500

*Counsel for Plaintiff*
*Goldman Sachs & Co.*

-32-