

# The Goldman Sachs Group, Inc. (and its affiliates)

## Policies Regarding the Safeguarding of Confidential Information: The Chinese Wall and Other Information Barriers

*Revised October 12, 2009*

(*Revision History, page 26*).

Formerly *"Policies and Procedures Regarding Confidential or Proprietary Information, the Chinese Wall and Personal Trading"*

S

# Table of Contents

I.   **Introduction** .................................................................................................................. 1

   *Goldman Sachs Business Principle # 12* ....................................................................... 1
   A.   *Purpose and Scope* ................................................................................................ 1
   B.   *Confidential Information* ......................................................................................... 1
   C.   *The Firm's Information Barriers* ............................................................................. 2
   D.   *Applicability of this Policy* ...................................................................................... 2
   E.   *Additional Policies* ................................................................................................. 2
   F.   *Enforcement of these Policies* ............................................................................... 2
   G.   *Conflicts Clearance* ............................................................................................... 3
   H.   *Glossary of Terms* ................................................................................................. 3
   I.   *Related Policies* ..................................................................................................... 3

II.  **General Policy on Information Barriers — the Safeguarding and Use of Confidential Information** ................................................................................................... 4

   A.   *Core Policy Statements* ......................................................................................... 4
   B.   *Protection of Client Information* ............................................................................. 6
   C.   *Material Nonpublic Information about the Firm: Trading in Securities of The Goldman Sachs Group, Inc.* ....................................................................................... 6
   D.   *Changes in Business Structure, Reporting Relationships, Physical Moves, and Other Changes in Information Flows* ............................................................................ 7

III. **The Chinese Wall and Other Information Barriers** ............................................. 8

   A.   *Basic Rules Applicable to Private-Side Employees Sharing Information Across the Chinese Wall* .............................................................................................................. 8
   B.   *Wall Crossing Procedures in Connection with Information Barriers Generally* .............. 10
   C.   *Monitoring Wall Crossed Individuals* ................................................................... 12
   D.   *Inadvertent Receipt or Disclosure of Nonpublic Information* .............................. 13
   E.   *Other Information Barriers* ................................................................................... 13

IV.  **Information Barrier Controls** .......................................................................... 16

   A.   *Information Control Lists* ...................................................................................... 16
   B.   *Physical and Systems (IT) Barriers* ...................................................................... 18

V.   **Glossary** ...................................................................................................... 20

   A.   *The Chinese Wall* ................................................................................................ 20
   B.   *Confidential Information* ....................................................................................... 20
   C.   *Designated Wall Cross Approver* ......................................................................... 21
   D.   *The Federation* ................................................................................................... 21
   E.   *Information Barriers* ............................................................................................ 21
   F.   *Illegal Insider Trading* ......................................................................................... 22
   G.   *Insider* ................................................................................................................ 22
   H.   *Material Nonpublic Information* ............................................................................ 22
   I.   *Nonpublic Information* .......................................................................................... 24
   J.   *The "Private" and "Public" Sides of the Firm* ....................................................... 24
   K.   *Proprietary Information* ........................................................................................ 24
   L.   *Securities* ........................................................................................................... 25
   M.   *Wall Crossing/Wall Crossing Procedures* ............................................................ 25
   *Revision History* ....................................................................................................... 26

**Appendix: Grey List Procedures** ........................................................................ 27

   A.   *Placement of Securities on and Removal from the Grey List* ............................... 27

B.    *Pre-Clearance; Other Approvals* .................................................................................... *27*

# I.  INTRODUCTION

## Goldman Sachs Business Principle # 12

**We regularly receive confidential information as part of our normal client relationships. To breach a confidence or to use confidential information improperly or carelessly would be unthinkable.**

## A. Purpose and Scope

As a global investment banking, securities, and investment management firm, Goldman Sachs[1] provides a wide range of services to corporations, governments, institutional investors, high-net-worth individuals, and other clients (collectively "clients").[2] In connection with providing these services, the firm receives confidential information from and about its clients. Controlling access to that information is not only good business practice, but is also required by firm policy and applicable laws. This policy sets out the basic requirements relating to the appropriate control, handling, and use of that confidential information.[3]

## B. Confidential Information

Confidential information is information that is not publicly available. It is generally provided to the firm by our clients or others, commonly in the investment or merchant banking context, although other businesses also may receive confidential information in the ordinary course.  See also the description of Confidential Information in the Glossary (page 20).

Nonpublic information about issuers[4] and their securities, sometimes referred to as inside information, is a type of confidential information.[5] See also Nonpublic Information in the Glossary (page 24).

---

[1]  The Goldman Sachs Group, Inc. and its affiliates are also referred to in this policy as "Goldman Sachs" and "the firm." "GS Inc." refers to The Goldman Sachs Group, Inc.

[2]  This policy will use the term "clients" to refer to clients, customers, and counterparties.

[3]  While all information entrusted to the firm is covered by the principles in this policy, this policy should be read in conjunction with other firmwide policies and regional, divisional, and business-unit policies which may have additional details on the handling and protection of:

- Client information relating to trading activity or positions
- Personal information subject to privacy laws.

[4]  Issuers may be corporations, governments or governmental agencies and bodies, supranational institutions, and other entities that have issued securities.

[5]  See Glossary, "Securities and Other Financial Instruments."

## C. *The Firm's Information Barriers*

The firm maintains information barriers reasonably designed to prevent and detect unapproved access to or distribution of confidential information. The various information barriers at the firm are documented by and implemented according to this policy and by the relevant divisional policies.

## D. *Applicability of this Policy*

This policy is applicable to all firm employees.[6] It is intended solely for the use and benefit of the firm and does not create any obligations to, nor is intended to be enforceable by, clients or any third parties.

## E. *Additional Policies*

In addition to this firmwide policy, there are various information barrier policies at the regional, divisional, and business levels. All employees must make sure that they are aware of any policies and procedures that apply to them. (See <u>Related Policies</u>, below.)

## F. *Enforcement of these Policies*

The firm takes any misuse, misappropriation, or improper dissemination of confidential information seriously. Misuse and misappropriation of confidential information can violate contractual obligations, laws, rules, or regulations in various jurisdictions in which the firm does business and give rise to both civil liabilities and criminal penalties for the firm and for individual employees. Furthermore, even the suggestion of misuse or misappropriation of confidential information can lead to serious reputational harm for the firm. For employees, violations of these policies may lead to disciplinary action, including dismissal, and may need to be reported to regulatory or legal authorities and/or future employers.

**Ongoing Obligation of Confidentiality**

The duty to safeguard confidential information **extends beyond your employment.** Upon leaving the firm, you may be required to sign an acknowledgement of this continuing obligation and to certify that all confidential information entrusted to you in physical or electronic form has been returned to the firm or destroyed. Even in the absence of such an acknowledgement, you are bound to comply with your obligations under firm policies.

Breaches or possible breaches of the obligations to safeguard confidential information must be reported promptly to the <u>Control Room</u> in your region,[7] or a

---

[6]   When this policy (and other policies referenced by this policy) uses the term "employee" or "firm personnel," it includes all contingent workers and service providers as well, unless the contracts of such individuals have express conditions to the contrary. See "Note to Contingent Workers and Service Providers" on the Table of Contents page of the <u>Compendium of Firmwide Policies</u>."

[7]   If the Control Room in your region is not available, contact any of the other regional Control Rooms.

compliance officer[8] or a lawyer supporting your business area. The firm also has other policies that may require the reporting of breaches and possible breaches of law, regulation, and firm policy. See "Reporting Legal, Ethical, Accounting, Internal Accounting Controls, Auditing, Personnel, Health, Safety, Environmental, and Other Firm Policy Issues." See also Guidance Regarding Inappropriate Proprietary and Employee Trading for reporting possible insider trading violations.

## G. Conflicts Clearance

This policy does not address business selection and conflicts clearance, which is a separate global process designed to minimize reputational, legal, and/or client relationship risk. Pursuant to that process, proposed advisory assignments, financing transactions, merchant banking transactions, and specified Securities Division proprietary investments/transactions are required to be reviewed by the Business Selection and Conflicts Management Group **before** the firm accepts confidential information or otherwise becomes engaged. (See, e.g., Securities Division Conflicts Clearance/Business Selection Policy and Procedures, Conflicts Clearance Policy for Investment Banking Division / Financing Group and policies applicable to PIA, REPIA, and IIG.)

## H. Glossary of Terms

Please see the Glossary, beginning on page 20 for explanations of the certain terms used in this policy.

## I. Related Policies

### 1. Firmwide Policies

- Best Practices for Protecting Proprietary and Confidential Information
- Consultants: Enhanced Policies and Procedures
- Global Privacy Policy
- Intellectual Property Belonging to Goldman Sachs
- Policies and Procedures Regarding Membership of Firmwide, Regional, and Divisional Committees and the Handling of Confidential Information
- Protection of Private Information about Individuals and Agents

### 2. Divisional and Regional Policies

See divisional and regional Web pages for other information-barrier policies applicable to your business area.

---

[8] If you do not have designated compliance coverage, consult your manager or the Control Room in your region.

## II. GENERAL POLICY ON INFORMATION BARRIERS — THE SAFEGUARDING AND USE OF CONFIDENTIAL INFORMATION

### A. Core Policy Statements

#### 1. Protecting Confidential Information

Confidential information must be safeguarded from misuse, misappropriation, or improper dissemination.

- Employee use or disclosure of such information must be consistent with:
  - The firm's Need-to-Know standard.
  - Laws and regulations, such as those relating to insider trading.
  - Terms of confidentiality agreements, engagement letters, non-disclosure and similar agreements.
  - In the absence of an agreement, situations in which the client has a reasonable expectation that the information will be kept confidential.
  - Applicable wall-crossing procedures and other firm and divisional policies.

  See Confidential Information in the Glossary for further details. Consult with the Legal Department if there is a question about our obligations for confidentiality.

- Confidential information is subject to these rules unless and until:
  - The party to whom we have a duty of confidentiality has authorized its use or dissemination.
  - Confidential information has been made public other than through a breach of our obligations.
  - Its use or dissemination does not otherwise violate disclosure laws; insider trading rules; or other relevant laws, rules, regulations, or policies.
  - Termination or expiration of obligations under a confidentiality or other agreement.
  - The Legal Department directs otherwise.

#### 2. Applying the Need-to-Know Standard

Confidential information should be shared only with persons who have a need to know the information to perform their duties and to carry out the purpose(s) for which the information was provided.

You may not ask for or make an effort to obtain confidential information if you do not need to know the information.

3. **Trading on, Using, or Disseminating Material Nonpublic Information**

An employee who is aware of material nonpublic information about an issuer or its securities is prohibited from:

- Buying or selling the issuer's securities in personal (including certain related persons'), client, or firm accounts.

- Directing, soliciting, inducing, encouraging, or recommending the purchase or sale of those securities.

**(a) Determining Whether Information is Nonpublic**[9]

As used in this policy, "nonpublic information" is information that is not available to the public about an issuer[10] (including The Goldman Sachs Group, Inc.) or its securities.

Nonpublic information can be obtained from a number of different sources, including but not limited to directors, officers, employees, or other "insiders" of the issuer; any persons acting on behalf of the issuer, such as accountants, bankers, lawyers, consultants, lobbyists, or finders; or unrelated third parties who are not themselves the source of the information but received the information from such a source.[11] Third parties can include persons acting on behalf of Goldman Sachs, such as consultants, finders, and lobbyists, whether or not retained pursuant to a written agreement.[12]

**(b) Determining Whether Nonpublic Information is Material**

The following are generally considered in determining whether information is material:

- Is there a substantial likelihood that it would be viewed by a reasonable investor as important in making an investment decision?

- Would its disclosure be viewed by a reasonable investor as having significantly altered the total mix of information otherwise available?

- Is it information that could reasonably be expected to affect the price of a security?

Materiality is highly fact specific, and materiality judgments are frequently second-guessed in hindsight. Accordingly, **you may not make materiality**

---

[9] Err on the side of caution. Regulatory sensitivity to the improper use of material nonpublic information is high, and penalties and reputational damage can be significant. In addition, the regulatory landscape in many jurisdictions continues to evolve. Therefore, unless the information has already been broadly disseminated through the media or other widespread distribution channels, seek the advice of the Control Room in your region or a compliance officer or lawyer who supports your area before disclosing the information.

Individuals within an information barrier may share information (on a Need-To-Know basis) with others within the same barrier.

[10] Includes issuers of securities even if the securities are not publicly listed or traded.

[11] Insiders can also include those who have recently left a position where s/he was an insider.

[12] The Enhanced Policies and Procedures Regarding Consultants requires, among other things, that employees on the public side of the firm specifically inform consultants and other service providers working with them that they may not reveal any material nonpublic information about an issuer or its securities. Make sure that you are familiar with the requirements of that policy before beginning any work with consultants.

**determinations on your own**. These determinations must be made by a senior business leader in consultation with a lawyer who supports the relevant business area.

(See the Glossary "Material Nonpublic Information" beginning on page 22, for a more detailed description and for examples of the types of information considered material.)

### 4. Receipt of Confidential Information in the Ordinary Course of Business

Groups that receive confidential information from clients in the ordinary course of their business are required to log that information on appropriate control lists (such as the Grey List or other Confidential Lists).

### 5. Disclosing Information on Behalf of an Issuer

Nonpublic information should not, generally, be accepted from an issuer with the understanding that the firm will distribute the information to the public and/or use the information in a research report. Distribution of nonpublic information about an issuer, even with the issuer's knowledge or at the issuer's request, may be prohibited in some jurisdictions and may subject the firm, and the individual distributing the information to regulatory and criminal sanctions. Do not make such a disclosure without first clearing it with a lawyer who supports your business.

## B. Protection of Client Information

Depending on the circumstances, clients may have an expectation of confidentiality regarding the information they give us. In some cases, we have signed confidentiality agreements, letters of engagement, non-disclosure or similar agreements that impose contractual confidentiality responsibilities on us. In other cases, as previously noted, an "agreement" may be implied from industry practice, a client's course of dealing with us, a conversation with the client, or a notice we have provided. The Legal Department should be consulted if there is a question as to whether an expectation or agreement exists.

In the sales and trading context (and with respect to dialogue among clients, research, and sales and trading), divisional policies address divulging, sharing, or using client trading and position information within the firm or with issuers or other clients. If you have any question about whether information may be shared or used in a sales or trading context, consult a compliance officer or lawyer supporting your area.

## C. Material Nonpublic Information about the Firm: Trading in Securities of The Goldman Sachs Group, Inc.

The restrictions and limitations on using, trading on, or disseminating material nonpublic information also apply to material nonpublic information regarding GS Inc. To avoid any appearance of its employees trading on inside information of GS Inc., the firm limits transacting in GS Inc. securities to specific window periods; transactions are prohibited when the windows are closed. Employees who have or may have access to material nonpublic information about the firm are subject to

longer restricted periods. Details about these restrictions and other limitations can be found on the GS Web page, <u>Transactions in GS Inc. Securities</u>.

## D. Changes in Business Structure, Reporting Relationships, Physical Moves, and Other Changes in Information Flows

The control of information must be kept in mind whenever reporting or working relationships are changed, new applications or systems are deployed or reconfigured, physical moves are made, groups are reconfigured, new businesses are formed, or new offices are opened (see <u>Systems and Physical Barriers</u>.) All such changes should be reviewed by divisional compliance and the Control Room in your region before they are implemented.

# III. THE CHINESE WALL AND OTHER INFORMATION BARRIERS

To satisfy various legal and regulatory requirements, and reputational concerns, the firm has information barriers in place reasonably designed to prevent and detect improper information flows. The firm's information barriers combine technological controls and access limitations, a Need-to-Know standard, physical separation, wall crossing procedures for sharing information across barriers and trading restrictions. Some or all of these are applied, as necessary, depending on the nature of the business and the type and sensitivity of the information being protected. The various controls relating to information barriers at the firm are documented and implemented according to these policies and procedures, and by the relevant regional, divisional, and business unit policies. Employees are trained on the relevant firm policies and provided with periodic reminders about them. In addition, the firm carries out monitoring, surveillance, and testing of various trading activities and information flows to review the effectiveness of the barriers.

In this policy, the phrase "Chinese Wall" refers to the "classic" information barrier between (i) the firm's investment and merchant banking businesses/advisory businesses, on one side (the "private" side), and (ii) the sales, trading, and other non-investment banking businesses, on the other (the "public" side). Other information barriers also exist around and within other businesses in the firm — GSAM, the Specialist Businesses, between Investment Banking and Research, around certain businesses in the Securities Division, and elsewhere. Each has its own set of controls — e.g., trading limitations, technological controls, policies, surveillances, physical separation, monitoring requirements, and wall crossing procedures — set out in divisional policies.

## A. Basic Rules Applicable to Private-Side Employees Sharing Information Across the Chinese Wall

### 1. Private-Side Employees

Private-side employees may not divulge confidential information to anyone on the public side of the wall unless there is a compelling business need and then only in strict observance of the firm's wall crossing procedures.

### 2. Public-Side Employees

Unless wall crossed or otherwise complying with relevant divisional policies regarding receipt of confidential information, public-side employees should not be exposed to or seek to obtain confidential information.[13]

---

[13] There are certain businesses on the public side that may receive confidential information in the ordinary course of their business. These businesses operate under procedures for handling and logging of confidential information, which are detailed in divisional policies.

3. **Persons Who are Not Designated as Public or Private – <u>Federation Employees</u>**

Employees in the Federation (see <u>Glossary, the Federation</u>) are not considered to be "public" or "private." The application of Chinese Wall rules (or other information barrier rules) to them — personal trading restrictions, technological controls and physical separations, wall crossing procedures, etc.— depends on the businesses they support and their exposure to material nonpublic information in the normal course of their jobs. Generally, such Federation personnel will be subject to similar information barrier restrictions/controls as the businesses they support. In addition, as with all firm personnel, Federation personnel are subject to the same rules regarding handling of confidential and proprietary information and the Need-To-Know standard.

As with all employees, Federation personnel who receive or become aware of confidential information may not disclose such information, without following appropriate wall crossing procedures.[14]

See <u>Information Barriers and Trading and Access Restrictions Applicable to the Federation</u>.

4. **Persons who are "Above the Wall" in the Public/Private Context**

There is a small group of senior business leaders and senior Federation leaders at the firm who are considered to be "Above the Wall." That group consists of all members of the firmwide Management Committee, and other senior business leaders who oversee both public and private businesses and, therefore, regularly may have access to both public and nonpublic information.

Above-the-Wall persons who become aware of material nonpublic information, whatever the source, should not disclose that information to anyone (even another Above-the-Wall person) who does not have a need to know it, nor should they trade or direct, induce, recommend, encourage, or solicit transactions in the securities for any account. Above-the-Wall persons are also subject to additional restrictions and are treated in a manner similar to persons who are on the private side.

The firm's <u>Policy and Procedures Regarding Membership of Firmwide, Regional, and Divisional Committees and the Handling of Confidential Information</u> is applicable to Above-the-Wall persons who are members of various firmwide, regional and divisional committees. This policy requires, among other things, that the Control Room be notified if material nonpublic information is disseminated to Above-the-Wall members who oversee public businesses in the course of committee business or discussed in committee meetings.

5. **Firmwide, Regional, and Divisional Committees**

Firmwide, regional and divisional committees are characterized as either private or public, except for the firmwide Management Committee, which is considered to be "Above the Wall." Please see the firm's <u>Policy and Procedures Regarding</u>

---

[14] As is detailed in the <u>Information Barriers and Trading and Access Restrictions Applicable to the Federation</u>, Federation employees may, on a Need-to-Know basis, disclose confidential information to other Federation employees who are subject to the same Information Barrier restrictions as they.

Membership of Firmwide, Regional, and Divisional Committees and the Handling of Confidential Information that sets out various procedures applicable to restricting membership on private committees, designation of committees' Chinese Wall status and handling of material nonpublic information disseminated to committee members and discussed in committee meetings.

## B. *Wall Crossing Procedures in Connection with Information Barriers Generally*

Wall crossing is the process by which an employee who is on one side of an information barrier is granted access to material nonpublic information from the other side of an information barrier. The need to wall cross arises when someone with material nonpublic information requires the expertise of an individual who works outside of his/her information barrier. In some cases, it may be possible to obtain this expertise without disclosing material nonpublic information; in other cases, more detailed discussions, may be necessary. These more detailed discussions would require a wall cross. Wall crossing may also be needed to share information about principaling opportunities.

Wall crossings are managed by Compliance. In the case of the Chinese Wall and certain other information barriers, wall crossing is handled by the Control Room; in other cases, wall crossings are handled by Divisional Compliance. Specific procedures may differ depending on the business units, but in a typical wall cross, the Control Room/Divisional Compliance will do the following:

- Receive a request to wall cross an individual who is on the other side of an information barrier.

- Obtain approval from the individual's supervisor/manager ("Designated Wall Cross Approver" (also see Self-Approvers, below) to wall cross the individual.

- Determine the parameters of the wall cross (what information is to be shared; what kind of restrictions will be imposed on the wall crossed individual, etc.).

- Notify the individuals involved (the individual who requested the wall cross and the individual being wall crossed) of the approval of the wall cross.

- Log the wall cross.

- Remove the name of the individual from the wall cross list when the relevant information becomes public or is no longer material, and notify the wall crossed individual that s/he has been removed from the list.

The firm's wall crossing procedures are designed to, among other things:

- Limit the information provided to the wall crossed individual to only that information necessary for the individual to respond to the inquiry, thereby allowing the firm to narrow the restrictions on the wall crossed individual as much as possible.

- Make sure, at the outset, that the right person or persons are wall crossed in each instance, thereby limiting the number of persons who have material nonpublic information.

- Limit wall crossing to those instances where there is a compelling business need.

- Avoid, wherever possible, the sharing of information that is not likely to become public for a long time, thereby limiting the duration of any restrictions that are imposed.

- Allow Compliance to better track, manage, and monitor wall crossings and the activity of wall crossed individuals, including notifying/confirming with the wall crossed individual when the wall cross has ended.

## 1. Rules for Wall Crossed Individuals

While you are wall crossed:

- **Do not trade or direct, induce, recommend, encourage, or solicit** transactions in the relevant securities for any account.[15]

- **Do not disclose** material nonpublic information (or even reveal that you are aware of material nonpublic information or that you have been wall crossed with respect to a specific issuer) to any person whether inside or outside the firm and regardless of where the individual works. If it becomes necessary to disclose material nonpublic information to another person in the firm, check with the Control Room/Divisional Compliance so that appropriate wall crossing procedure can be completed **before disclosing the information.**

## 2. Rules for Communicating with Wall Cross Approvers and Wall Crossed individuals

Employees with material nonpublic information must be careful about what they discuss with Wall Cross Approvers and wall crossed individuals. Disclosures to any employee who is involved in the approval of a wall cross should limit the information they provide to just the information necessary for the Approver to make his/her determination. Disclosures to wall crossed individuals should be limited to that information necessary for that individual to provide the needed expertise.[16]

In all cases (with the limited exception of "Self-Approvers"), no information should be disclosed until the individual requesting the wall cross has received authorization to do so from the Control Room/Divisional Compliance.

- If you have any question about what information you may disclose, even to someone who has been wall crossed, check with the Control Room in your region/Divisional Compliance before disclosing any information to him/her.

- Be careful about disclosing information that may remain nonpublic for an extended period of time, as this could prevent the wall crossed individual

---

[15] Employees may, as agent, execute **unsolicited** market or limit orders from client even when aware of material nonpublic information relating to the security the client wishes to trade.

[16] In many cases, revealing only the name of the issuer to be discussed (without revealing the nature of the discussion) to the Wall Cross Approver does not require wall crossing the Approver.

from crossing back and resuming his/her regular business activities quickly.

- If you have any question about whether an individual has been wall crossed, check with the Control Room in your region/Divisional Compliance before disclosing any information to him/her.

### 3. Self-Approvers

Some senior managers are "Self-Approvers," that is, they can consent to their being wall crossed without the approval of a separate Wall Cross Approver.

Self-Approver status must be approved by the individual's Division Head and the Head of the applicable Divisional Compliance.

With the one exception that the Control Room/Divisional Compliance may contact the Self-Approver directly about a requested wall cross, all other information barrier and wall crossing rules and processes apply to Self-Approvers, including:

- Individuals who need to share confidential information with a Self-Approver must contact the Control Room/Divisional Compliance to request that the Self-Approver be wall crossed.[17]

- The individual must wait for confirmation of the wall cross from the Control Room/Divisional Compliance before discussing material nonpublic information with the Self-Approver.

- Discussions with a wall crossed Self-Approver must be confined to information about the matter for which the wall cross was requested.

- Self-Approvers may not share confidential information with any other individual (including another Self-Approver) unless that person has been wall crossed regarding the matter to be discussed.

Any questions about Self-Approver status should be addressed to the Control Room in the region/Divisional Compliance, which keeps the Self-Approver lists.

### 4. Crossing Back

The Control Room/Divisional Compliance will ordinarily allow a wall crossed individual to resume normal activities when the information is no longer material or the information has become public.

## C. Monitoring Wall Crossed Individuals

Surveillances of personal trading of wall crossed individuals and, where appropriate, on client and firm trading, is performed until a determination is made that the information is no longer material or the information has become public and the wall crossed employee's regular activities can be resumed.

---

[17] In certain instances that have been agreed in writing with the Control Room/Divisional Compliance, specific private side areas may be permitted to contact the Self-Approver directly, with contemporaneous notification to the Control Room/Divisional Compliance.

These surveillances include:

- Surveillance of the personal trading of the wall crossed individual.
- Accounts of PWM representatives where the representative has been wall crossed.
- Pattern-based surveillance of relevant firm accounts against the wall cross lists.

## D. *Inadvertent Receipt or Disclosure of Nonpublic Information*

If an employee (in a business area that does not ordinarily receive confidential information) inadvertently becomes aware of information s/he suspects may be nonpublic information about a security or issuer, s/he **must** restrict his/her activities relating to the issuer and its securities and **must** contact the Control Room in his/her region or a compliance officer or lawyer supporting his/her area without delay to determine whether the information is nonpublic and material. Such person may not further disseminate the information, or trade or direct, solicit, recommend, or induce others to trade in the securities.[18]

Conversely, if a person within an information barrier inadvertently discloses confidential information to someone outside of that barrier, s/he should report the disclosure the Control Room in his/her region or a compliance officer or lawyer supporting his/her area without delay.

Control Room personnel (in consultation with appropriate Business and Legal Department personnel) will then assess whether the information is nonpublic and material, and whether to impose restrictions.

A person who inadvertently receives material nonpublic information will be treated as if s/he had been wall crossed.

Employees should be mindful that the private side of the firm is not the only source of information that could restrict their activities. You should be sensitive about conversations with personnel in business units that are protected by information barriers and/or from clients that could have material nonpublic information. Receiving such information, no matter what the source, is likely to restrict your business activities.

## E. *Other Information Barriers*

In addition to the traditional investment banking Chinese Wall, there are information barriers in place in respect of a number of businesses, including but not limited to:

### 1. **Certain Businesses within the Securities Divisions**

Within the Securities Division, certain business units, in the ordinary course of business, receive confidential information. Depending on the nature of that information and the nature of the business, these areas are subject to information barrier controls, including trading restrictions. Examples of these include Bank Loan Trading, Special Situations Group (SSG), and Principal Finance.

---

[18] Employees may, as agent, execute **unsolicited** market or limit orders from client even when aware of material nonpublic information relating to the security the client wishes to trade.

Global Securities Services also has established an information barrier designed to protect sensitive information relating to its clients' positions and activities from other parts of the firm.

For specific information on these information barriers, see divisional policies and/or divisional compliance personnel.

## 2. Specialist Activities

Goldman Sachs broker-dealers acting as specialists, designated market makers, primary market makers, lead market makers, or in a similar capacity (collectively "Specialists") in stocks, options, or exchange-traded funds on one or more securities exchanges in the US receive information about market interest in their specialist securities that assist them in maintaining an orderly trading market in those securities. As a result, the various US exchanges impose certain requirements, including information barriers between the Specialists and other businesses and/or their affiliates. The information barrier procedures must be approved by each exchange on which a Goldman Sachs affiliate acts as a Specialist.

The procedures are designed to limit the extent to which management of Goldman Sachs may influence a Specialist's operations; to protect confidentiality of information relating to the Specialist book; to limit the firm's potential to influence the Specialist business in connection with initiating proposed research and investment banking engagements; and to prevent the flow of material nonpublic information gained from the firm to the Specialist.

The procedures are also designed to prevent the Specialist from providing information from its book that could be used by sales and trading to front run trades on the Specialist's book.

Details of the Specialist information barrier policies and procedures can be found in divisional policies.

## 3. Global Investment Research

Information barriers between Global Investment Research (GIR) and other areas of the firm have been established that are designed to ensure that:

- Areas outside GIR do not benefit from draft research or from information relating to any proposed rating changes.
- Employees outside of GIR do not seek to obtain draft research or influence research.
- Employees of GIR do not disclose research views pre-publication.

### Chaperoning Equities Research/IBD Interactions

In addition, enhanced requirements have been implemented under the Global Research Settlement to ensure that research is not improperly influenced by investment banking. (See Policies Implementing Addendum A to the Research Settlement).

Generally, only certain permitted communications may occur between IBD and equity research analysts. The communications that are permitted must (with very limited exceptions) take place with a "chaperone" from the Control Room. In the

case of e-mail, the firm has implemented technology barriers that restrict e-mail between IBD and GIR.

### 4. GSAM

For a variety of legal, regulatory, and business reasons, GSAM is separated by an information barrier from other businesses at the firm, including PWM, investment banking, and the sales and trading businesses.

GSAM employees should not disclose any confidential or proprietary information about its business plans or portfolio activities or about its clients to any other part of the firm without specific clearance from the Compliance Division or Legal Department personnel who serve both GSAM and the part of the firm receiving the information. Likewise, GSAM employees should not accept any such information from other areas of the firm.

Under no circumstance should any employees of the firm outside GSAM attempt to influence decisions of GSAM portfolio managers either directly or by attempting to provide them with confidential or proprietary information from their businesses.

In addition within GSAM, there are a number of different groups that for a variety of reasons, have established their own information barriers. These areas include but are not limited to the Private Equity Group ("PEG"), Liberty Harbor, GS Investment Partners ("GSIP"), Hedge Fund Strategies ("HFS"), Global Manager Strategies ("GMS"), and the bank loan group.

Details of the GSAM information barriers policy and procedures can be found in GSAM divisional policies.

### 5. Federation and Management Personnel in Certain Jurisdictions

In certain jurisdictions, regulations impose restrictions on Federation personnel supporting and senior managers overseeing businesses on both sides of an information barrier. See local policies for such restrictions.

### 6. The Swiss Bank

Goldman, Sachs & Co. Bank is a Swiss private bank supervised by the Federal Banking Commission of Switzerland (SFBC). Because the Bank is organized as a Swiss bank, the rules and regulations regarding Swiss banking secrecy[19] apply. Therefore, the Bank is not allowed to disclose any information to other Goldman Sachs affiliates regarding the identity of any client without the client's explicit approval (except for certain very limited circumstances involving AML compliance).

### 7. Other Information Barriers

Additional information barriers are, from time to time, established as business activities change and businesses are developed. These are documented in the divisional and regional compliance policies.

---

[19] Clause 47 of the Swiss Banking Law.

# IV. INFORMATION BARRIER CONTROLS

## A. *Information Control Lists*

The firm maintains lists of securities and issuers, which are used to control and monitor confidential and other information. These lists, which include the Grey and various other "Confidential" Lists, the Wall Cross List, and the Restricted Trading List, together serve to:

- Record the receipt of material nonpublic or confidential information or certain other occurrences, as described throughout this section.

- Identify the names of securities on which trading restrictions may be imposed.

- Facilitate the trade monitoring/surveillance designed to identify possible breaches of policy, information barriers, and/or insider trading rules.

- Allow the firm to break trades or freeze or liquidate positions, as appropriate, due to possible conflicts, breaches of policy or rule, and/or for reputational reasons.

The Global Compliance Surveillance Group surveils employee (and employee-related), firm, and/or client transactions against these lists as appropriate, according to the Group's procedures.

### 1. Grey List

The Grey List is a list of securities of issuers about which the firm may have received material nonpublic information. A security will ordinarily be placed on the Grey List when (i) the firm has received material nonpublic information concerning that security or its issuer in the course of the firm's involvement in a possible transaction or other event that has not been publicly announced; (ii) the firm has been engaged to advise the company with respect to a market-sensitive transaction; or (iii) when the firm signs a confidentiality letter or executes an engagement letter.[20]

While the Grey List does not restrict firm trading, it does restrict private-side and certain other employees from transacting in Grey Listed securities. (See Appendix: Grey List Procedures for certain exceptions.)

Information on the Grey List can be very sensitive, and accordingly the list is available only to a small number of employees.

Employees on the private side, Above-the-Wall persons and certain Federation personnel, including those supporting private businesses, are required to "pre-clear" their personal and related account trades with the Control Room against the Grey List.

---

[20] See also, Grey List Procedures for more on the placement and removal of names from the Grey List.

### The Watch List

The Watch List is a subset of the Grey List. It is currently suspended under a pilot program. See <u>Watch List Procedures (Suspended)</u>.

## 2. Confidential Lists

A number of public-side businesses receive confidential information in the ordinary course of their business. The receipt of such information is maintained on Confidential Lists or "Confi" Lists.

Desk employees must pre-clear personal trading against their respective Confi Lists and are restricted from trading in securities related to the names on relevant Confi Lists.

## 3. The Wall Cross List

The Wall Cross List is a list of public-side employees who have been wall crossed to receive material nonpublic information usually for the purpose of providing expertise to an individual or individuals working on an investment banking or merchant banking assignment or opportunity. Public-side gatekeepers are also wall crossed, and placed on the Wall Cross List, when they receive material nonpublic information in connection with a potential principal investment or financing opportunity.

Individuals who are wall crossed (and related accounts) are not permitted to trade in the names for which they are wall crossed. Any exceptions would require pre-clearance from the Control Room.

## 4. The Restricted Trading List ("RTL")

To avoid the appearance of impropriety and for certain legal and regulatory reasons, the firm maintains a Restricted Trading List ("RTL").[21] The RTL is a list of securities that generally restricts trading in firm accounts and employee and related accounts. In some instances, the RTL can also limit or restrict client activity. Securities are added to the RTL for a variety of reasons: the firm is involved in an announced banking transaction with an entity, there are regulatory restrictions on transactions, the firm is releasing "significant" research, the firm's holdings are approaching certain reporting thresholds, et al. The RTL is coded to indicate the reason and type of restrictions imposed.

The RTL is available to all firm employees on the firm's <u>RTL Web page</u>. In addition, the RTL Codes appear along with the security names on Market Vendor Services screens.[22]

---

[21] GSAM clients and portfolios are not subject to the firm's RTL. GSAM maintains its own restricted trading lists such as the AMRTL, PEGRTL, LHRTL, GSIPRTL, etc. (see <u>Asset Management Restricted Trading Lists, page 18</u>). However, GSAM employees, like all employees of the firm, are subject to the firm's RTL in regard to trading in their personal and related accounts. Note, also, that all RTL-R restrictions do appear on the AMRTL.

[22] Market Vendor Services is a third-party service providing quote information to our trading and sales people. The RTL designations, except for those relating to debt products, are added to the Market Vendor screens by the firm's systems. For restrictions on debt products, employees should rely only on the firm's <u>RTL Web page</u>.

The <u>RTL</u> is solely for the internal use of the firm. No one should engage in discussions regarding whether a security is on the RTL with persons outside the firm without the express consent of the Control Room. The fact that a security is on the RTL should not be disclosed to clients or others outside the firm.

See the firm's <u>Restricted Trading List Policy</u> for details, including the meanings of all RTL Codes and the process for placing and removing names from the RTL.

Questions about the RTL should be referred to the <u>Control Room</u> in your region.

## 5. Asset Management Restricted Trading Lists

The Asset Management Restricted Trading Lists, including, but not limited to the Asset Management Restricted Trading List and desk-specific confidential lists (PEGRTL, LHRTL, GSIPRTL, et al.), contain the names of companies whose securities are restricted from purchase or sale for GSAM clients because those companies may be affiliates of Goldman Sachs or because of other regulatory reasons. In some instances the restrictions apply only to certain securities of the company, and in some cases the restrictions apply only to certain GSAM accounts.

Unless otherwise noted on the applicable Asset Management Restricted Trading List or unless prior approval has been obtained from the Control Room or GSAM Compliance, all GSAM-managed accounts, worldwide, are restricted from entering transactions (including derivative equities transactions, *e.g.*, swaps) in the securities related to an issuer listed on the list.

## B. Physical and Systems (IT) Barriers

Physical and IT Systems barriers and IT access controls play integral roles in the firm's information barriers. (See also "<u>Changes in Business Structure, Reporting Relationships, Physical Moves, and Other Changes in Information Flows</u>.")

### 1. Physical Barriers

Different levels of physical access restrictions are placed on the business depending on the nature of the business, the nature of the information that the business handles, and the impact if such information were available to other businesses. These restrictions include, for example, keeping business desks from being adjacent to one another to reduce the likelihood of accidentally viewing or overhearing information, physical barriers such as floor-to-ceiling walls on the same floor with limited access, placement of businesses on different floors with key or card access on doors, etc.

### 2. Systems Barriers and Access Control

Access to information through IT systems is managed in accordance with information barrier/Need-To-Know requirements. As with physical barriers, there is a range of systems controls available. These levels include, for example:

- Permission by individual ID to applications and data.

- Establishment of protected/isolated access zones behind firewalls/gateways or other secure systems environments to reduce the risk of unintentional access to protected information.

- Blockage of e-mail communications between certain areas.

As a general matter, information security standards require that individuals be granted permission to access only those applications and data that are necessary for the performance of their duties.

Businesses are responsible for granting and removing permissions when individuals leave the firm or transfer to another area of the firm.

There are limited circumstances in which individuals request so-called "dual-access systems," systems with access to applications and/or data on both sides of an information barrier. These requests must be handled on a case-by-case basis, taking into account the business requirements, personal trading surveillance, the control of physical access to dual-access systems, appropriate training of personnel with dual access, and the like.

Questions about dual access should be referred to IBD Compliance in the case of private-side access; in other cases, to the compliance officer supporting the relevant business.

# V. GLOSSARY

- The Chinese Wall
- Confidential Information
- Designated Wall Cross Approver
- The Federation
- Information Barriers
- Illegal Insider Trading
- Insider
- Material Nonpublic Information
- Nonpublic Information
- The "Private" and "Public" Sides of the Firm
  - The "Private" Side
  - The "Public" Side
- Proprietary Information
- Securities and Other Financial Instruments
- Wall Crossing/Wall Crossing Procedure

## A. *The Chinese Wall*

The Chinese Wall is the information barrier between (i) the investment and merchant banking areas and other advisory businesses of the firm, on the one hand, and (ii) the sales and trading and other non-advisory areas of the firm, on the other. (See Information Barriers.) It was first established in response to regulatory requirements to protect material nonpublic information in the investment banking business — the so-called "private side" — from becoming available to the sales and trading side — the so-called "public side" — of the firm.

According to US regulators, the minimum necessary elements of a "Chinese Wall" include:

> ...review of employee and proprietary trading, memorializing and documenting of firm procedures, substantive supervision of inter-departmental communication by the firm's compliance department, and procedures concerning proprietary trading when the firm is in possession of material, nonpublic information... Adequate Chinese walls must include policies and procedures reasonably designed to limit or contain the necessary flow of material, nonpublic information to employees who have a "need to know."[23]

While the term "Chinese Wall" is generally used to refer to the information barrier between investment banking and sales/trading, many of the elements that comprise the wall are relevant anywhere there is a need to establish an information barrier to separate one business from another.

## B. *Confidential Information*

For the purposes of this policy, "confidential information" is information that has not been made public. It includes information provided to the firm under confidentiality

---

[23] SEC Report by the Division of Market Regulation, March 1990.

agreements, engagement letters, non-disclosure and similar agreements, implied agreements of confidentiality based on past conduct, or where there is a reasonable expectation that the information will be kept confidential or used only for a particular purpose. It also includes such information as financial information, significant changes in business management, offerings of securities, etc., before it is disclosed.

Confidential information may include nonpublic ("inside") information about an issuer or its securities. Confidential information also includes nonpublic information from private entities.

Confidential information should be used for the specific purpose for which it was provided or developed.

## C. *Designated Wall Cross Approver*

A "Designated Wall Cross Approver" is a designated manager or supervisor who is located on the same side of an information barrier as person being wall crossed (e.g., in the case of the public/private information barrier, the public side). The Wall Cross Approver liaises with the Control Room/Divisional Compliance in connection with approving the wall cross of an individual. S/he reviews wall cross requests and approves, as appropriate, one or more individuals to be crossed.

The Wall Cross Approver may, but does not always, receive confidential information in order to facilitate consideration of the wall cross request. Accordingly, the Wall Cross Approver, ideally, should be an individual who **is not** active in day-to-day sales and trading or other public-side businesses or the day-to-day supervision of such businesses. In some situations, however, a direct manager is the best person to make an appropriately informed decision about an individual wall cross.

## D. *The Federation*

People who work in areas such as Technology, Operations, HCM, Finance, the Executive Office, Legal, Compliance, Management Controls and Corporate Services (collectively called the "Federation") are not considered to be on the "private" or the "public" sides of the firm, and may support different businesses, including both public and private businesses and businesses separated by other Information Barriers. For this reason, the information barrier restrictions applicable to Federation personnel will depend on the exposure of those personnel to confidential information. Generally, such Federation personnel will be subject to similar information barrier restrictions/controls as the businesses they support. In addition, as with all firm personnel, Federation personnel are subject to the same rules regarding handling of confidential and proprietary information and the Need-To-Know standard.

See Information Barriers and Trading and Access Restrictions Applicable to the Federation for further information about Information Barriers relevant to Federation employees.

## E. *Information Barriers*

The term "information barrier" is a generic term for any separation established between areas of the firm for the purpose of controlling improper information flows. The firm maintains information barriers reasonably designed to prevent and detect such improper information flows. (See also "Chinese Wall," above.)

The firm's information barriers combine technological controls and access limitations, a Need-to-Know standard, physical separation, wall crossing procedures for sharing information across barriers and trading restrictions. Some or all of these are applied, as necessary, depending on the nature of the business and the type and sensitivity of the information being protected. The various controls relating to information barriers at the firm are documented by and implemented according to these policies and procedures, and by the relevant regional, divisional, and business unit policies. Employees are trained on the relevant firm policies and provided with periodic reminders about them. In addition, the firm carries out monitoring, surveillance, and testing of various trading activities and information flows to review the effectiveness of the barriers.

## F. Illegal Insider Trading

The classic definition of insider trading is trading in the securities of a company or other issuer by an insider while the insider is aware of material nonpublic information. In the US, the SEC and courts have expanded that definition to include insiders who solicit, recommend, induce others to trade ("tipping"), trading by the persons who are tipped, and trading by those who have misappropriated material nonpublic information.[24] In other jurisdictions, the definitions may vary.

Not all trading by insiders or those who receive information from insiders is illegal. There are some safe harbors available to insiders to trade their securities. For instance, many corporations (including Goldman Sachs) create window periods (typically immediately after quarterly announcements) in which corporate insiders are permitted to buy and sell their securities.

## G. Insider

An insider is a person typically affiliated with an issuer with access to nonpublic information about an issuer. The term refers not only to people inside an issuer — directors, officers, large shareholders, and employees of an issuer — but also to those working closely with them and who are privy to nonpublic information — advisors, accountants, attorneys, consultants, and the like. Depending on the situation, insiders may also include close relatives of insiders.[25] An insider can also include an individual who was recently in a position where s/he was an insider.

## H. Material Nonpublic Information

The determination of whether nonpublic information is material is highly fact specific. Under US securities laws, nonpublic information is deemed "material" if:

- There is a substantial likelihood that it would be viewed by a reasonable investor as important in making an investment decision.

---

[24] SEC, Investor Information, Fast Answers – Key Questions, Insider Trading, http://www.sec.gov/answers/insider.htm.

[25] The definition of insiders can vary from jurisdiction to jurisdiction. In addition, in some jurisdictions, the firm is required to maintain a list of insiders both at the firm and with whom the firm deals (e.g., the EU Market Abuse Directive Insider List requirements).

- Its disclosure would be viewed by a reasonable investor as having significantly altered the total mix of information otherwise available.

**OR**

- It is information that could reasonably be expected to affect the price of a security.

In most jurisdictions, including the US, information about the following subjects (among others) may, depending on the circumstances, be considered material. Note that information may be considered material even if it relates to contingent, uncertain, or rumored events. [26]

- Changes in dividends or dividend policy
- Financial forecasts or projections (especially estimated earnings or losses for the next reporting period and the next year)
- Changes in previously released earnings or earnings estimates
- Significant changes in accounting practices[27]
- Significant write downs of assets
- Significant additions to reserves for bad debts
- Significant expansion or curtailment of operations
- Significant increases or declines in orders
- Significant developments regarding clients or suppliers
- Significant pricing changes
- Significant product developments
- Major litigation or significant regulatory actions
- Liquidity problems: bankruptcy, reorganization, negotiations with creditors on debt repayment
- Significant increases in executive compensation
- Changes of a loss into income or vice versa
- Information that, in the past, has caused significant volatility in the firm's stock price

- Significant changes in management
- Contests for corporate control
- Anticipated proxy votes
- Anticipated public offerings of securities
- Research and credit-rating changes
- Significant proposed corporate actions, including refinancing or refunding outstanding obligations, repurchase programs, tender or exchange offers, recapitalizations, leveraged buy-outs, acquisitions, mergers, restructurings, or purchases or sales of assets
- Changes in auditors or an auditor's notification that the issuer may no longer rely on an auditor's audit report
- Embargoed government reports and statistics
- Unannounced government actions
- Significant omissions or misstatements in financial reports
- Changes in earnings or other trends
- Accounting misstatements intended to "manage" reported earnings

---

[26] Other jurisdictions have similar concepts although the definitions may differ.

[27] By "significant" we mean reasonably likely to affect the value of the securities of the company or reasonably likely to affect an individual's decision to buy, sell, or hold those securities.

## I.  Nonpublic Information

Nonpublic Information in the context of this policy is synonymous with "inside" information: Generally, nonpublic information is information about an issuer of securities or its securities that has not been disclosed to the public and was obtained from an insider (which can include third parties).

See: Insider (above), also the Enhanced Policies and Procedures Regarding Consultants.

## J.  The "Private" and "Public" Sides of the Firm[28]

### 1.  The "Private" Side

Employees on the private side of the firm have access to confidential information and potentially material nonpublic information about issuers and their securities in the ordinary course of their businesses. The firm's private side or advisory businesses include, but are not limited to:[29]

- IBD, including the Financing Group
- The Mortgage Advisory Group and Bank Loan Syndication
- MBD
- Strategic Lead Management Group in IMD

### 2.  The "Public" Side

The "public side" refers to all businesses that are not on the "private side," including the sales and trading businesses, and other groups that conduct business in the public markets.

## K.  Proprietary Information

"Proprietary information" is information that belongs to the owner, whether that owner is a client, an individual or entity, or Goldman Sachs. Firm proprietary information includes such things as client lists, new products, the firm's trading positions and strategies, trading algorithms, strategic plans, risk models, intellectual property including the means by which the firm protects those (such as patents, copyrights, and trademarks), software systems and code, Web-based applications, and the like.

- Proprietary information is often confidential, but may not be. In many cases, it may fall under copyright or trade secrecy protections. For instance, a database or algorithm that a company creates and licenses to others is proprietary (the company maintains its ownership and controls the terms of its use) but not confidential (because it is available in the

---

[28] Historically, the public and private sides of the firm have been called the "sales and trading" and "advisory" sides, respectively. ("Advisory" refers to the investment banking business, not advice on investments.) "Public" and "private" are the terms that are generally used in this document.

[29] The businesses listed here are examples only. The names and the structures of the firm's businesses change from time to time. If you are unsure whether a given business is public or private, ask your manager, the Control Room, or a compliance officer or lawyer supporting your area.

marketplace, albeit for a price). On the other hand, an entity's trading positions would be both proprietary and confidential.

In general, proprietary information should not be shared or used except when the owner has granted permission.

## L. Securities

This term "securities," as used in this document, includes, but is not limited, to:

- All equity and debt securities issued by entities, governments, and supranational organizations; other financial instruments including derivatives relating to those securities; and security-based swap agreements.
- Certificates of participation
- Limited partnership interests
- Investment contracts
- Futures relating to securities and stock indices and options on such futures.

## M. Wall Crossing/Wall Crossing Procedures

In its traditional sense, "wall crossing" involves exposing a public-side employee to confidential information from the private side of the firm.[30] The "wall crossing procedure" is the formal process used to approve, identify, and monitor individuals who have been wall crossed.

The NASD and NYSE recognize that:

> ...Occasions arise when the investment banking department requires information from the research or sales departments. Such occasions necessitate procedures that allow an investment banking employee to obtain the needed information...In these instances, it may be necessary to bring a research or sales employee "over the wall."[31]

See also Wall Crossing Procedures in Connection with Information Barriers Generally (beginning on page 10).

Wall crossing is also used between other areas where there are information barriers. The procedures are generally similar to those in wall crossing between the private and the public sides. (See Wall Crossing Procedures in Connection with Information Barriers Generally.)

---

[30] More generally, a wall crossing is any situation in which an individual within an information barrier seeks permission to share information with someone outside that barrier. When wall crossings are permitted, processes and controls must be in place designed to prevent the inappropriate use of the information by the wall crossed individual.

[31] NASD/NYSE Joint Notice to Members 91-45.

## Revision History

- October 12, 2009 (current, removal of RTL details into a separate RTL Policy)
- September 30, 2009
- July 28, 2009
- Nov 11, 2008
- September 8, 2008
- April 15, 2008
- March 27, 2008 (Major rewrite: Title change from "Policies and Procedures Regarding Confidential or Proprietary Trading, the Chinese Wall")
- August 21, 2007
- October 31, 2006
- February 21, 2006
- July 1, 2004
- November 15, 2002: First Compendium posting

# APPENDIX: GREY LIST PROCEDURES

## A. *Placement of Securities on and Removal from the Grey List*

The Grey List is a list of securities of issuers about which the firm may have received material nonpublic information. A security will ordinarily be placed on the Grey List ("GL") when (i) the firm has received material confidential information concerning that security or its issuer in the course of the firm's involvement in a possible transaction or other event that has not been publicly announced; (ii) the firm has been engaged to advise the company with respect to a market-sensitive transaction; or (iii) when the firm signs a confidentiality letter or executes an engagement letter. Information on the Grey List can be very sensitive, and accordingly the list is available only to a small number of employees.

Decisions to place a security on the GL involve questions of judgment and not merely the application of arbitrary or mechanical standards. Some securities relevant to a particular advisory engagement may not be materially affected by the subject of the engagement or confidentiality letter. For example, the acquisition by a very large company of a much smaller company may not be material to the price of the acquirer's shares. For this reason, advisory personnel should discuss the engagement with the Control Room and the lawyer(s) serving the business when determining whether to place an issuer and related securities on the GL.

A security ordinarily will be removed from the GL when the persons designated in the appropriate divisional policies determine that it is no longer necessary to monitor research, sales, and trading activities with respect to the security or its issuer.

It is essential that personnel engaged in advisory activities be alert to circumstances that might require a security to be listed on or de-listed from the GL. Once the decision to list or de-list an issuer from the GL, personnel from the relevant business unit should request the listing or de-listing promptly. Employees should consult relevant divisional compliance policies[32] for guidelines as to Grey Listing and to determine who in the business unit has the authority to request GL changes. When in doubt, a senior team member involved in the transaction should be consulted.

## B. *Pre-Clearance; Other Approvals*

While the GL does not restrict firm trading, it does restrict private-side and certain other employees from transacting in GL securities.

- Employees on the private side, Above-the-Wall persons, and certain Federation personnel, including those supporting private businesses, are required to "pre-clear" their personal and related account trades with the Control Room against the Grey List.
- When a security has been placed on the GL relating to an offering of securities, the release of research with respect to the security will be subject to compliance review prior to release to ensure that the research complies with applicable legal restrictions. (The timing and scope of this review may vary in different jurisdictions.)

---

[32] See, for example, Grey Listing Names of Certain William Street Borrowers and Policies and Procedures Regarding Confidential or Proprietary Information, The Chinese Wall (IBD Chinese Wall Bulletin)